UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

ARTHUR ROMERO                                    CIVIL ACTION NO. 04-1284

VS.                                                          JUDGE MELANÇON

JO ANNE BARNHART, Commissioner          MAGISTRATE JUDGE METHVIN
Social Security Administration

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, it is

recommended that the Commissioner's decision be **REVERSED** and that judgment be rendered

in favor of Romero for disability insurance benefits with an onset date of October 3, 2001.

### *Background*

Born on October 2, 1959, Arthur Romero ("Romero") is currently 45 years old.  Romero

has a high school education and worked in the past as an instrument technician.  Romero applied

for disability insurance benefits on March 6, 2002, alleging disability as of October 3, 2001 due

to coronary disease, sleep apnea, and neck and back pain.[1]  Following an administrative hearing,

the ALJ rendered an unfavorable decision on January 26, 2004.[2]  The Appeals Council denied

review, making the ALJ's decision the final decision of the Commissioner from which Romero

now appeals.

---

[1] Tr. 51 and 74.

[2] Tr. 16-23.

### *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

### *Procedure for Analysis of Impairments and the ALJ's Findings*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1.  If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2.  A person who does not have a "severe impairment" will not be found to be disabled.

3.      A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4.      If a person can still perform his past work, he is not disabled.

5.      If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

When a mental disability claim is made, such as the depression alleged here, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The procedure can be summarized as follows:

1.      The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he or she has a medically determinable mental impairment. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004),[3] citing 20 C.F.R. §404.1520a(b)(1).

2.      If a medically determinable mental impairment is found, the ALJ must then rate the degree of functional limitation resulting from the impairment. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(b)(2). To perform this latter step, the ALJ should assess the claimant's degree of functional limitation in four areas: (1) activities of daily living; (2) social functioning; (3) persistence or pace of concentration; and (4) episodes of decompensation. See C.F.R. §404.1520a(c)(3). If the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal

---

[3] The undersigned was unable to find any Fifth Circuit cases setting forth the proper procedure for analyzing mental disability claims since the revisions and amendments to 20 C.F.R. §404.1520a in 2000. The revisions and amendments became effective on September 20, 2000. 65 Fed. Reg. 50,746 (August 21, 2000). See Boyd v. Apfel, 239 F.3d 698, 705 n.11 (5th Cir. 2001). The Serrano-Diaz decision is therefore cited as the most succinct summary of the current law that the undersigned was able to find during research for this report and recommendation.

limitation in the claimant's ability to do basic work activities. <u>Serrano-Diaz v. Barnhart</u>, 2004 WL 2431693, *6 (E.D.Pa. 2004), <u>citing</u> 20 C.F.R. §404.1520a(d)(1).

3.  When a severe mental impairment is found, the Commissioner determines whether the impairment meets or exceeds the requirements of the Listings. <u>Serrano-Diaz v. Barnhart</u>, 2004 WL 2431693, *6 (E.D.Pa. 2004), <u>citing</u> 20 C.F.R. §404.1520a(d)(2) (2002).

4.  When the severe mental impairment does not meet Listing requirements, the Commissioner then assesses the claimant's residual functional capacity. <u>Serrano-Diaz v. Barnhart</u>, 2004 WL 2431693, *6 (E.D.Pa. 2004), <u>citing</u> 20 C.F.R. §404.1520a(d)(3) (2002).

The procedure states that if the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, *unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities*. <u>Serrano-Diaz v. Barnhart</u>, 2004 WL 2431693, *6 (E.D.Pa. 2004), <u>citing</u> 20 C.F.R. §404.1520a(d)(1). In the Fifth Circuit, courts adhere to the standard set forth in <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir.1985) in assessing the severity of an impairment. In <u>Stone</u>, the Fifth Circuit declared that severity of an impairment must always be determined with regard to an individual's *ability to perform substantial gainful employment,* and cannot be based on medical severity alone. Moreover, the Fifth Circuit articulated the correct severity standard as follows:

[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

<u>Stone</u>, 752 F.2d at 1101. The court further stated that "[W]e will in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an

express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used." Id. at 1106.

In the instant case, the ALJ concluded that Romero has "a combination of impairments that imposes significant work-related limitations so as to constitute a severe impairment."[4] The ALJ concluded, however, that Romero could perform light duty work. Applying the Medical-Vocational Guidelines, the ALJ concluded that Romero was not disabled.

### *Assignment of Errors*

Romero alleges that the ALJ erred in the following manner: 1) in applying the Medical Vocational Guidelines; 2) in failing to adhere to the special duty required when a claimant is unrepresented by counsel; and 3) in finding that Romero could maintain substantial gainful activity on a regular basis.

### *Medical History*

**_Coronary disease_**: On October 8, 2001, Romero was examined by Dr. Jon D. Leleux, a cardiologist, for chest discomfort.[5] After Romero's exercise stress test was "markedly abnormal," Dr. Leleux scheduled a heart catheterization. On October 9, the catheterization was performed and "revealed that [Romero] had severe native 3 vessel disease, as well as significant branch vessel disease."[6] Therefore, a five-vessel bypass surgery was performed. On

---

[4] Tr. 19.

[5] Tr. 238-241.

[6] Tr. 217.

December 26, 2001, Dr. Leleux completed an "Attending Physician's Statement of Disability" indicating that from a cardiac standpoint, Romero could not return to work for six months.[7]

On January 15, 2002, Romero was again examined by Dr. Leleux complaining of chest pain.[8]  On January 21, 2002, an angiogram revealed that two of Romero's vein grafts had occluded and therefore an angioplasty and stenting was performed.[9]  On April 2, 2002, Dr. Leleux reported that he "did not think that Mr. Romero's medical condition would allow him to work a job that requires 24 hour a day on call duty as well as climbing."[10]  On May 31, 2002, it was noted that Romero had completed 36 sessions of cardiac rehabilitation.[11]  From March, 2002 through February, 2003, Romero was treated by Dr. Masri Mohamad.  In February, 2003, Dr. Mohamad reported that Romero's cardiac disease resulted in slight limitation of physical activity, with ordinary physical activity resulting in fatigue, palpitation, dyspnea, or anginal pain.[12]

On February 20, 2003, Romero was examined by Dr. Leleux for continued chest pains.[13] On February 24, 2003, Dr. Leleux performed catheterization which showed occlusion and a lesion a vessel.[14]  It was recommended that these issues be dealt with with medication.  On August 21, 2003 Dr. Leleux noted that Romero was being referred to have enhanced external

---

[7] Tr. 206.

[8] Tr. 201-202.

[9] Tr. 187.

[10] Tr. 178.

[11] Tr. 170.

[12] Tr. 372.

[13] Tr. 155-157.

[14] Tr. 142.

counterpulsation (EECP), which is a non-invasive out-patient treatment for heart disease and, in particular, for angina (chest pain due to an inadequate supply of oxygen to the heart muscle).[15] Dr. Leleux concluded that if EECP was unsuccessful in relieving Romero's symptoms, "it will be unlikely if this gentleman will be able to maintain a regular job which involves any degree of physical exertion."[16]

*Neurological problems and sleep apnea*:  On May 14, 2002, Romero was examined by Dr. Leleux, complaining that a few days before, he was gardening and coughed to "clear throat and had a syncopal episode."[17]  Dr. Leleux referred Romero to a neurologist, Dr. Neil B.C. Billeaud.  On June 11, 2002, Dr. Billeaud examined Romero, noting that Romero complained of at least two episodes in which he had an alteration of consciousness.[18]  Dr. Billeaud noted that the possibility of seizure disorder existed, as well as possibly ischemic cerebrovascular disease. Dr. Billeaud advised Romero that he could not drive for at least a month and he scheduled an MRI (magnetic resonance imaging) of the brain and a MRA (magnetic resonance angiogram) of the head and neck.  The tests were performed on July 3, 2002, with the MRI of the brain being normal, but the MRA of the neck showing bilateral atherosclerotic disease in the carotid arteries.[19]  An electroencephalography (EEG) was normal.[20]  On July 11, 2002, Dr. Billeaud

---

[15]  "EECP is designed to relieve angina by improving perfusion in areas of the heart deprived of an adequate blood supply. EECP uses a device to inflate and deflate a series of compressive cuffs that are wrapped around the calves and lower and upper thighs."  http://www.medterms.com/script/main/art.asp?articlekey=32143

[16] Tr. 505.

[17] Tr. 173.

[18] Tr. 499-411.

[19] Tr. 400-402.

[20] Tr. 403.

reviewed the test results with Romero and concluded that Romero's sleep apnea was the cause of his problems.[21]

In July, 2002, Romero was examined by Dr. Richard Fei, a pulmonary specialist, regarding his sleep apnea.[22] Dr. Fei diagnosed "severe obstructive sleep apnea" and noted that Romero had excessive daytime sleepiness. In August, 2002, Dr. Fei noted that Romero had hypotension, but his lungs were stable, and therefore he would tolerate sleep apnea surgery well.[23] On August 7, 2002, Romero was examined by Dr. David J. Foreman, an otolaryngologist, who diagnosed "severe obstructive sleep apnea" and recommended UPPP surgery (wherein the surgeon removes excessive soft tissue from the back of the throat to relieve obstruction),[24] tonsillectomy, septplasty, turbinoplast.[25] The surgery was performed on August 29, 2002 at Our Lady of Lourdes Hospital.[26] On October 31, 2002, Romero reported that he was 80-90% better with his sleep problems.[27] On January 23, 2003, Dr. Foreman performed radiofrequency ablation of the tongue to further relieve Romero's sleep problems.[28] On March 24, 2003, Romero

---

[21] Tr. 399. On August 27, 2001, Romero underwent a sleep study, which revealed obstructive sleep apnea. Dr. Mark Petitjean, an otolaryngologist, prescribed a nasal CPAP mask (continuous positive airway pressure). On September 21, 2001, Dr. Petitjean examined Romero and recommended that he undergo surgery to relieve the sleep apnea. Tr. 125-127.

[22] Tr. 435-437.

[23] Tr. 430.

[24] Uvulopalatal pharyngoplasty. *See* http://www.medterms.com/script/main/art.asp?articlekey=5510

[25] Tr. 474-475.

[26] Tr. 463-464.

[27] Tr. 460.

[28] Tr. 452.

underwent a sleep study at Sleep Solutions of Lafayette.[29]  The result of the study was "no

significant obstructive sleep apnea demonstrated, no significant nocturnal cardiac arrhythmia, no

significant periodic limb movement disorder, no explanation for account for his complaint of

snoring."[30]

    ***Depression***: On May 13, 2002, Romero's wife called Dr. Leleux's office with concerns

that Romero "cries all of the time, is easily irritated, very angry and does not socialize and sleeps

a lot also."[31]  On June 28, 2002, Romero was examined by Dr. Mohamad regarding his general

problems, and Dr. Mohamad noted that Romero had chronic anxiety and depression and Dr.

Mohamad recommended that Romero use Paxil, an anti-depressant.[32]

    On August 6, 2002, at the request of the Disability Determination Services, Romero was

examined by Alfred E. Buxton, Ph.D., a clinical psychologist.[33]  Dr. Buxton noted that Romero

was prescribed Paxil.  Dr. Buxton's impression and recommendation was as follows:

> Clinically [Romero] would present with an Adjustment Disorder with Depressed
> Mood (DSM-IV, 309.00) with degree of impairment moderate and prognosis fair;
> chronic pain with degree of impairment mild to moderate and prognosis fair; and
> a Breathing-Related Sleep Disorder (DSM-IV, 780.59).  He also presents with a
> history of significant cardiovascular problems.  Continued medical monitoring
> and management of the cardiovascular problems and his sleep difficulties would
> be appropriate.  Additionally, outpatient mental health intervention to deal with
> the Adjustment Disorder and chronic pain would be appropriate...  If, and when,
> he should demonstrate significant positive improvement in his overall general
> functional status, emotive and physiologic alike, as demonstrated through

---

[29] Tr. 444.

[30] Tr. 444.

[31] Tr. 175.

[32] Tr. 386-388.

[33] Tr. 439.

feedback from treating professionals and interventionists, then a referral to Louisiana Rehabilitation Service for assessment, training, and job placement would be appropriate. Any such referral prior to him demonstrating such significant lasting positive improvement would be premature.[34]

In August, 2002, a Psychiatric Review Technique ("PRT") was conducted by the Social Security Administration ("SSA").[35] The examiner found that Romero has moderate restrictions of his activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace.[36] He further concluded that there was insufficient evidence regarding whether Romero has had an episode of decompensation.[37] A mental residual functional capacity assessment was also conducted by SSA and the examiner concluded that Romero's mental abilities were not significantly limited, with the exception that Romero has moderate limitations in the areas of ability to understand and remember detailed instructions, ability to carry out detailed instructions, and ability to interact appropriately with the general public.[38]

***Neck pain***: On October 23, 2001, a CT scan of Romero's cervical spine was performed at Our Lady of Lourdes which showed a mild annular bulge at C3-4, minimal spondylosis at C4-5 with slight deformity of the thecal sac, and significant central stenosis at C5-6 related to a central

---

[34] Tr. 441.

[35] Tr. 486-499.

[36] Tr. 496.

[37] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." 20 CFR Pt. 404, Subpt. P, App. 1

[38] Tr. 502.

disc protrusion with associated bony arthropathy.[39] In November and December, 2001, Romero was treated by Dr. Ricardo Leoni, a neurosurgeon, for his neck, shoulder, and left arm pain.[40] On December 18, 2001, Dr. Leoni noted that Romero has osteoarthritis at C4-5 and 5-6, but that he had responded well to physical therapy and therefore he did not need to return unless he had additional problems.[41]

On July 24, 2002, at the request of DDS, Romero was examined by Dr. Samuel Stagg, an internist. Dr. Stagg found no muscle spasm and found that Romero's cervical pain is secondary to probable cervical disc disease.[42]

### *Findings and Conclusion*

Romero's medical history shows that he continues to be treated by Dr. Leleux for coronary disease, which seriously affects his ability to work. On August 21, 2003, Dr. Leleux reported:

> Mr. Arthur Romero is a 42-year-old gentleman who is under my care. He has known coronary disease, status post bypass and has hyperlipidemia.[43] He has frequent angina pectoris with an form of exertion. He presently has unrevascularized myocardium that we cannot approach percutaneously and is being treated medically. This, however, does limit his lifestyle. He is only able to walk approximately 50 feet prior to developing chest discomfort. He is presently being referred to have EECP.[44]

---

[39] Tr. 214-215.

[40] Tr. 364-366.

[41] Tr. 364.

[42] Tr. 421-423.

[43] An elevation of lipids in the bloodstream. http://www.americanheart.org/presenter.jhtml?identifier=4600

[44] Enhanced external counterpulsation: A non-invasive out-patient treatment for heart disease and, in particular, for angina (chest pain due to an inadequate supply of oxygen to the heart muscle). "EECP is designed to relieve angina by improving perfusion in areas of the heart deprived of an adequate blood supply. EECP uses a

> At this point in time, this gentleman's present degree of cardiovascular disease does limit his lifestyle. The duration of his disability is unknown at this point in time and depends entirely on whether his symptoms improve or not. If they do not improve with the EECP, then it will be unlikely if this gentleman will be able to maintain a regular job which involves any degree of physical exertion.[45]

Likewise, Romero has depression, which Dr. Buxton found must improve prior to his being employable.[46]

The ALJ is entitled to determine the credibility of the examining physicians and medical experts and to weigh their opinions accordingly. Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994). The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). Further, the ultimate issue of disability is reserved to the Commissioner. Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990). The opinion of a treating physician on this issue is not entitled to controlling weight, although it should be given appropriate weight depending on whether it is supported by the medical record. 20 C.F.R. Sec. 416.927 (e) (1988).

In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a *realistic* work setting:

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831. We noted that "[a] claimant capable of performing sedentary or

---

device to inflate and deflate a series of compressive cuffs that are wrapped around the calves and lower and upper thighs." http://www.medterms.com/script/main/art.asp?articlekey=32143

[45] Tr. 505.

[46] Tr. 441.

light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world." *Id.* (*citing* Allred v. Heckler, 729 F.2d 529, 533 (8th Cir.1984)).

Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002).

The ALJ addressed Drs. Leleux and Buxton's reports as follows:

[I]n August, 2002, the claimant underwent psychological evaluation. The findings were indicative of an adjustment disorder with depressed mood and chronic pain. However, the claimant has no history of any mental health treatment. Mental status examination was within normal limits. The claimant's intellectual functioning was normal.

Dr. John D. Leleux reported on August 21, 2003, that the claimant has coronary disease, status post bypass, and hyperlipidemia. The claimant has frequent angina pectoris with any form of exertion. Dr. Leleux is medically treating the claimant for unrevascularized myocardium that cannot be approached percutaneously. According to Dr. Leleux, the claimant's cardiovascular disease limits his lifestyle and an EECP is recommended.[47]

The ALJ then discounted Romero's allegations that he cannot work because of the restrictions imposed by his impairments. The ALJ discounted Romero's credibility because he did not display any of the "indices generally associated with people who suffer from chronic pain" and because no examining physician has reported that Romero is incapable of all work.[48] The ALJ, therefore, assessed Romero's residual functional capacity as follows:

Accordingly, the Administrative Law Judge finds the claimant retains the following residual functional capacity: lifting no more than 20 pounds on an occasional basis and 10 pounds on a frequent basis, and standing or walking no more than six hours in an eight-hour day. The claimant has no non-exertional limitations. Environmentally, he should not be frequently exposed to extremes of temperature, dust, smoke, fumes, etc.; however, in a light or sedentary work base, there is no exposure these toxins. Mentally, there are minimal, if any restrictions.

---

[47] Tr, 18-19.

[48] Tr. 20.

His mental status examination was normal in August 2002. His intellectual functioning is normal. The absence of evidence that the claimant is not taking and apparently has not been taking any psychotherapy undermines the claimant's credibility regarding the severity of his condition. If his treating sources did not find his condition severe enough to warrant the prescription of medication or counseling, it is difficult to accept an assertion that his mental impairment is so severe that it precludes the performance of all work activities.[49]

The ALJ then relied upon the Medical Vocational Guidelines to find that Romero was not disabled.

Romero maintains that the ALJ erred in relying on the Guidelines because the report of Dr. Buxton shows that Romero has non-exertional limitations imposed by his depression. Romero also argues that substantial evidence does not support the ALJ's decision that Romero could perform work on a sustained basis.

Initially, the undersigned notes that the ALJ erred when he stated that Romero's August, 2002 mental status examination was normal. Dr. Buxton found Romero to have an adjustment disorder with depressed mood and moderate impairment, resulting in an opinion that Romero should not be referred for job placement prior to improvement of his physical and mental problems.[50] Thus, this examination did not result in a normal mental status report, and the resulting non-exertional limitations, which required treatment prior to job placement, precluded the use of the Guidelines. *See* Fraga v. Bowen, 810 F.2d 1296 (5th Cir. 1987) (when the claimant either suffers only from exertional impairments or his non-exertional impairments do not significantly affect his residual functional capacity, the ALJ may rely exclusively on the guidelines in determining whether there is other work available that the claimant can perform.

---

[49] Tr. 20.

[50] Tr. 441.

"Otherwise, the ALJ must rely upon expert vocational testimony or other similar evidence to establish that such jobs exist."); Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir.1985).

Further, the ALJ's assessment of Dr. Leleux's August, 2003 report is erroneous. The ALJ notes only that Dr. Leleux found Romero's lifestyle limited by his cardiovascular disease, yet the ALJ ignores Dr. Leleux's opinion that Romero can walk only 50 feet prior to having chest discomfort and that if these symptoms are not relieved by EECP, he is incapable of performing work that requires any physical exertion. Considering this, and Dr. Buxton's report indicating that medical and mental treatment are required prior to any job placement, the ALJ's statement that "No physician who has examined the claimant has reported that he is incapable of all work" is incorrect.

Also erroneous was the ALJ's statement that Romero was not using prescription medication to treat his depression. Dr. Mohamad prescribed Paxil, an anti-depressant.[51] The record is replete with references to Romero's use of Paxil.[52] Accordingly, the ALJ's reference to the non-use of medication as a basis to discount Romero's credibility was incorrect.

Additionally, with respect to the "stigmata" test, wherein the ALJ finds that Romero does not have the general "indices" of pain, this is essentially the same as the "sit and squirm" test which has been rejected by the Fifth Circuit. The ALJ stated, "The claimant has furthermore displayed none of the indices generally associated with people who suffer from chronic pain such as atrophy, impairment of general nutrition, signs of premature aging or poor overall health."[53]

---

[51] Tr. 386-388.

[52] Tr. 106, 422, 433, 440.

[53] Tr. 20.

The application of such an index by a judge who is not a medical expert results in unreliable conclusions, particularly where his observations are contrary to the overall medical evidence. See Spencer v. Schweiker, 678 F.2d 42, 45, n. 7 (5th Cir.1982), quoting Aubeuf v. Schweiker, 649 F.2d 107, 113 (2nd Cir.1981). The medical evidence supports Romero's allegations that he has chest pain and because of his impairments he is often sleepy, can walk only short distances, gets dizzy spells, and cannot lift things: he has undergone continued medical treatment for his chest pain and heart problems, including repeated surgical intervention, and his physician has reported that he will be incapable of work if his symptoms are not relieved by current therapy. Accordingly, I find the ALJ's "stigmata" test is unreliable and not a sufficient basis for discounting Romero's credibility.

Moreover, although the ALJ did not specifically cite to it, apparently the ALJ relied on the residual functional capacity assessment completed by a non-examining physician at the request of DDS indicating that Romero can perform light work.[54] An ALJ cannot rely on the opinion of a non-examining physician over that of a treating specialist. See, e.g., Barbee v. Barnhart, 2002 WL 31688886, *2 (5th Cir. 2002), citing Newton v. Apfel, 209 F.3d 448, 456-57 (5th Cir.2000) (cannot rely on opinion of non-examining physician over that of treating specialist); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir.1990) (ALJ may rely on a non-examining physician's assessment only where it does not contradict the examining physician); 20 C.F.R. §404.1527(d)(1) ( "Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). Considering Dr. Leleux's August, 2003 report, and the fact that the non-examining physician's assessment was

---

[54] Tr. 477-485.

rendered prior to Dr. Leleux's report, the ALJ was precluded from relying on the DDS report, and therefore, there is no substantial evidence of record supporting the ALJ's determination that Romero can perform light work.

The record shows that Romero has undergone continued treatment for heart problems since October, 2001 and that he has depression. Romero testified that he is easily fatigued, he cannot lift things such as trash cans, and he has dizzy spells. Further, two examining physicians have opined that Romero will only be able to perform work if and when his medical problems respond to treatment. Evidence of record does not show such abatement of symptoms with treatment. Clearly, these problems preclude Romero from performing work on a sustained basis. Accordingly, the undersigned finds that substantial evidence does not support the ALJ's decision that Romero is not disabled.

### *Conclusion*

For the foregoing reasons, the undersigned concludes that substantial evidence does not support the ALJ's determination of non-disability. Remand is appropriate only upon a showing of "good cause," which includes an "inability to make a definitive ruling concerning a claimant's disability based on the record before the court." Ferguson v. Schweiker, 641 F.2d 243, 250, n. 8 (5th Cir.1981). Because the record contains sufficient evidence to establish that Romero was disabled beginning October 3, 2001, it is unnecessary to remand the case for further findings.

**IT IS THEREFORE RECOMMENDED** that the ALJ's decision of non-disability be **REVERSED** and judgment be rendered in favor of Romero for disability benefits consistent with an onset date of October 3, 2001.

Any judgment entered herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  See, <u>Richard v. Sullivan</u>, 955 F.2d 354 (5th Cir. 1992) and <u>Shalala v. Schaefer</u>, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir.  1996).**

Signed at Lafayette, Louisiana, on June 30, 2005.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)